IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## MARLON R. JACKSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P22511     James C. Beasley, Jr., Judge**

---

**No. W2000-01887-CCA-R3-PC - Filed May 31, 2001**

---

The petitioner filed a *pro se* petition for post-conviction relief, later amended by appointed counsel, claiming that his 1999 pleas of guilty in the Shelby County Criminal Court were involuntary and that he received ineffective assistance of counsel. Following a hearing, the post-conviction court denied relief, and the petitioner timely appealed, raising the same two issues. We affirm the judgments of the trial court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which L. TERRY LAFFERTY, SR.J., joined. DAVID H. WELLES, J., Not Participating.

Charles W. Gilchrist, Jr., Memphis, Tennessee, for the appellant, Marlon R. Jackson.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner, Marlon R. Jackson, entered pleas of guilty on October 11, 1999, in the Shelby County Criminal Court to three counts of aggravated burglary and one count of especially aggravated robbery. He was sentenced, as a Range II offender, to ten years in each burglary case and twenty years in the robbery case, all sentences to be served concurrently.

On January 25, 2000, the petitioner filed a *pro se* petition for post-conviction relief, claiming that the pleas were involuntary because he had suffered a nervous breakdown prior to their entry and that his then counsel had been ineffective in a number of areas. Following a hearing on the petition, the post-conviction court denied relief. The petitioner timely appealed, presenting the same issues on appeal.

**DISCUSSION**

The transcript of the petitioner's pleas of guilty sets out the circumstances of the charges against the petitioner as well as of the pleas themselves:

> This cause came on to be heard and was heard on the 11th day of October, 1999, before the Honorable Joseph B. Dailey, Judge, holding the Criminal Court for Shelby County, at Memphis, Tennessee, and the following proceedings were had to wit:
>
> > (This case was set for trial and a motion in limine was heard prior to the guilty plea being entered, not made a part of this transcript).
>
> THE COURT:  I'll deny your motion in limine.
>
> MR. JOHNSON: Thank you, Your Honor.
>
> THE COURT:  I see that there's been a notice of intent and notice of impeachment filed in this matter, do you want to have a Morgan hearing at this point, I assume, or review these matters?
>
> MR. JOHNSON:  Your Honor, we can wait until after the state's proof.
>
> MR. BYER: Judge, just as a matter of clean-up, Your Honor, I know the Court will have that on occasion in four plea agreements after the fact based on the defendant's understanding at the time so I'd like to be certain that we have a clear understanding.
>
> This man's before the Court on four different indictments.  Three of which are aggravated burglary, one of which is a criminal attempt aggravated robbery.  His plea up until today has been twenty years to resolve all of those cases.  His record will reflect that he is high-end, range II, and it is the state's intention today that if we go forward in trial, after today, once we begin the trial, this man will have no offer and the twenty year offer will be revoked and we will, at some point, perhaps, reconsider when we get beyond thirty years if, in fact, we do.
>
> But, until we get to thirty years, after we start trial on this matter, I'd like the Court to accept that, at this point, everybody knows the offer's revoked.

THE COURT: I assume you've conveyed that to your client, Mr. Johnson?

MR. JOHNSON: Yes, Your Honor.

(A brief pause was had in the proceedings.)

Your Honor, would you indulge me for sixty seconds in the back?

THE COURT: That's fine. Take a recess.

(Whereupon, a recess was had, after which time the following proceedings were had:)

THE COURT: Is this matter resolved?

MR. JOHNSON: Yes, Your Honor, I'm filling the paperwork out now. I'm sorry, I really didn't expect this to happen.

THE COURT: Do you need a few more minutes to finish that up?

MR. JOHNSON: Yes, Your Honor.

THE COURT: We'll stand in recess.

(Whereupon, a recess was had, after which time the following proceedings were had, to-wit:)

MR. BYER: Your Honor, in indictment numbers 98-10209, 98-10210, 98-10211 and 98-10929, in the first three indictments he's charged with three separate incidences of aggravated burglary and in the last one he's charged with criminal attempt, to-wit; especially aggravated robbery.

Should Your Honor accept his plea of guilt to each of the aggravated burglaries, it's the state's recommendation that he pay no fine and serve ten years at the state penitentiary. All that time concurrent.

On the criminal attempt, to-wit; especially aggravated robbery, it's the state's recommendation he be sentenced to serve twenty years at the state penitentiary. That concurrent with the three burglaries, for a total time of twenty years.

THE COURT: What range?

MR. BYER: All that, range II, Your Honor.

BAILIFF HALL: Mr. Jackson step around and come forward.

MARLON JACKSON was called, sworn, examined and testified as follows:

EXAMINATION BY THE COURT:

Q. All right. Mr. Jackson, do you understand that you don't have to plead guilty, you have the right, of course, to plead not guilty and go to trial, today, in front of the jury. The jurors are outside of the courtroom as we speak. You'd be represented at that trial by your attorney, Mr. Johnson. He could cross-examine the state's witnesses. You could subpoena your own witnesses. You could testify on your own behalf, although you would not be required to. You could appeal those cases if you loss [sic]. You're giving up all of your pre-trial, trial and appellate rights be [sic] entering these guilty pleas, you understand that?

A. Yes.

Q. Are you pleading guilty freely and voluntarily?

A. Yes.

Q. Have you discussed your cases, thoroughly, with Mr. Johnson, your attorney?

A. Yes.

Q. Have you reviewed this paperwork that I have in my hand, and specifically – first, let me ask you – how far did you go in school?

A. Eleventh.

Q. So you can read and write without any problem?

A. Uh-uh.

Q. Is that your signature at the bottom of that document, (indicating)?

-4-

A. Yes.

Q. Did you review that document?

A. Yes.

Q. Do you have any questions about anything that's contained therein?

A. No.

Q. Do you have any questions, at all, about any aspect of this procedure?

A. No.

Q. All right. Step back down.

BAILIFF HALL: Return to your seat, behind your attorney.

(Defendant complied.)

MR. BYER: Judge, had we gone to trial, first, beginning with the indictment ending in 0-9, the state's proof would be that while researching various pawn transactions made by Marlon Jackson, a Sergeant Bolt located a pawn he had made at Cash America Pawn Number 12, on 12/3/97, where a Sharp, 19-inch color television, serial number 4-2-7-1-9-9 was pawned. Home address listed for Marlon Jackson on the pawn ticket was 5579 Crape Myrtle.

Sergeant Bolt researched all burglaries which occurred within a mile radius of that address up to one month prior to the pawn date.

Sergeant Bolt located a residential burglary filed by a Ronald Dodson of 5581 Crape Myrtle, which is next door to Mr. Jackson's listed home address.

On the many items listed as stolen by Mr. Dodson was a Sharp television. Sergeant Bolt submitted a pawn shop recovery request to Sergeant Wurling. They kept the television. Sergeant Wurling did recover the television and under the original pawn card, both were tagged as evidence.

On 4/17/98, Sergeant Bolt asked for a fingerprint comparison and the print from the pawn card came back to Marlon Jackson.

On 5/1/98, Sergeant Bolt contacted a Ronald Dodson. Was unable to give a serial number for the television but described a prominent crack located on the right front side where in fact he had dropped the television on a prior occurrence.

When Sergeant Bolt went and looked at the tagged television the pre-described crack was exactly as had been described.

With regards to the indictment ending in 1-0, on 3/17/98, between 8:50 and 10:10 a.m., Pamela Sparks residence, located at 2783 Senora Drive was forcibly entered by prying open a sliding glass door. Among the items stolen were several complete computer systems.

A neighbor witness, a Mary Hobinique (phonetically), observed a male fitting this defendant's description with three gold earrings in his left ear, driving an '89 Chevy Camaro, or Pontiac Trans-Am type vehicle with T-top, parked at 2783 Senora with a male loading computer assessories [sic] into the rear hatch-back.

That suspect information was included in a residential burglary report. On 3/19 Officer Quinn observed a 1989 Pontiac Trans-Am with T-top at Barbwood near Villawood, which matched the suspect[']s vehicle description.

After stopping the vehicle for traffic violations, Officer Quinn found Marlon Jackson driving. He matched the physical description, exactly, and he found in the back of that car, or observed in the back of that car, computer keyboards. Marlon Jackson was arrested on that case at that time.

In regards to the indictment ending in 1-1, the state's proof would be that while investigating Marlon Jackson, involving residential burglaries, Sergeant Bolt noticed that he had made numerous, recent pawn transactions. And one such transaction was a Cash American Pawn Number 4, in which a 19-inch Zenith television was pawned. Researching the burglary reports which were submitted on or about that date, a residential burglary report of a home owned by Bernice Brown at 5668 Los Gados Drive, number one, on 1/14/98, where her residence was forcibly entered by removing a glass window and among the items stolen was a Zenith television.

Sergeant Bolt obtained one card of prints from the west side bedroom window, which had marked as the likely point of entry. When those prints were submitted they came back to match this defendant, Marlon Jackson.

Had we gone to trial on those three matters we'd expect that would be our proof. As to the criminal attempt, especially aggravated robbery. On Thursday, June 19, 1997, at about 9:15 a.m. two males entered the V. F. Pawn Shop located at 3261 North Watkins, owned and operated by a James and Barbara Fenton.

One of the males asked Ms. Fenton to see wedding rings. The males left, but indicated that they would return to purchase the jewelry. Ms. Fenton saw the two males get into a small white vehicle and a few minutes later Ms. Fenton left the business. Shortly afterwards, the males returned and asked to see the same rings shown earlier. One of the males pulled a handgun, pointed it at James Fenton, demanded money. Mr. Fenton attempted to knock the suspect[']s weapon away, at which point the gun man fired, striking Mr. Fenton three times. Mr. Fenton then attempted to retrieve his own gun. The unarmed male alerted the gun man and more shots were fired before the suspects left in a small white vehicle.

James Fenton was transported to the Med in critical condition. Fingerprints were recovered by crime scene from the glass display case where the males viewed the jewelry. Mr. Fenton was later interviewed and indicated that that jewelry case was cleaned every evening and no one had been in the business prior to the two males that had come in that morning.

On April 30, 1998, investigators were notified that the prints matched up with Marlon Jackson. May 16th Marlon Jackson was interviewed and denied that he had ever been to that pawn shop or in a pawn shop in that area of town.

Had we gone to trial we would expect that to be our proof. I'd ask counsel to stipulate.

MR. JOHNSON: Your Honor, as to the three aggravated burglaries, we would stipulate that those would have been the facts presented had this matter gone to trial. As to the criminal attempt, especially aggravated robbery, Your Honor, that's basically been the stick up and the hold up in this entire plea negotiations set on these cases.

Your Honor, we would plead under Alford. My client denies this and we've discussed this at length. If the state, frankly, did succeed on two of these aggravated burglaries my client would be looking at the same amount of time to which he's pleading now, even if we were successfully [sic] in defending the criminal attempt, especially aggravated robbery and one of the aggravated burglaries, we'd still be looking – my client would be looking at, basically, the same amount of time that he's pleading to today.

For those reasons, Your Honor, my client has always denied, all along, about his complicity in the criminal attempt, especially aggravated robbery. In light of all that, Your Honor, in light of the facts that the state would have proceed[ed] today on the very strongest case that they had, in light of all that we'd ask the Court to accept the negotiated plea.

THE COURT: Stand up, Mr. Jackson.

(Defendant complied.)

I'll accept your guilty plea as being freely and voluntarily entered. To your plea of guilty to indictments 98-10209, 10 and 11, to the offense of aggravated burglary in each of those cases, I find you guilty, I fix your punishment in each case at confinement for ten years as a range II offender.

And in cause number 98-10929 to the offense of criminal attempt, to-wit; especially aggravated robbery, twenty years, range II, all to be served concurrently with each other.

Step out.

## ANALYSIS

The petitioner and his trial counsel were the only two witnesses testifying during the hearing on the petition for post-conviction relief.

The petitioner testified that he had completed the eleventh grade and later received his GED. He had been convicted in 1992 of one count of aggravated robbery and three counts of aggravated burglary. He agreed with the prosecutor that this amounted to "significant experience in the Criminal Courts."

The petitioner described his mental problems as "a slight mental nervous breakdown." He testified that his symptoms were paranoia, depression, hyperactiveness, and insomnia, and that he was still suffering from these same problems. He said that although these problems had existed before his arrest on the charges which are the subject of his post-conviction petition, he had not sought any treatment for them and had not received treatment, prior to his arrest, for any mental health problems. At the time of the hearing, he was incarcerated at the Northwest Correctional Facility and was not then under a doctor's care, nor was he taking any medication. He said that he had been placed on Elavil approximately a week after his pleas of guilty.

As for his complaints against his trial counsel, the petitioner testified that counsel did not visit him in the jail, although the petitioner asked that he do so; that he would provide no legal advice other than that the petitioner should accept the State's offer of guilty pleas; that he did no investigative work; that he talked to no witnesses; and that he did not file a *pro se* motion which the petitioner had prepared and sent to trial counsel for filing. He testified that he asked trial counsel to provide him with a transcript of the preliminary hearing, but did not receive it. He said that this transcript would have proven him innocent. The petitioner said that his trial counsel was not ready for trial on the day that the first trial was set and that he refused to accept clothing for the trial which the petitioner's wife had brought several months before the trial date.

The petitioner amplified on some of these claims by testifying that he faulted his trial counsel for not interviewing the State's witnesses. He said that he had not given names of witnesses whom he wanted to testify in his behalf other than his wife, who would have provided an alibi as to the robbery charge. He said that he had not told his trial counsel what his defense was as to the burglary cases. The petitioner prepared a motion for a speedy trial or to dismiss the charges and sent this to his trial counsel, but counsel did not file it. He said that his trial counsel had not asked for his explanation of having stolen merchandise in his car at the time of his arrest, and he had not volunteered information about it. He wanted trial counsel to "investigate" the prosecution witnesses on the robbery case, but he neither talked with trial counsel about the witnesses on the burglary cases nor discussed any defense to them. He told trial counsel that he wanted to get the robbery case "out of the way first and then tackle the burglaries."

The petitioner testified that he pled guilty because trial counsel and a bailiff had taken him into the hallway and "were urging [him] to take the time over and over again."

The petitioner's trial counsel testified that he had been employed as a Shelby County Assistant Public Defender for approximately five years and had been trial counsel in forty to fifty cases during that time. He said that the petitioner had neither done nor said anything which indicated the need for a mental evaluation, and there was nothing in his background which indicated a need for one to be done. He said that the petitioner was able to assist him in the trial preparation. The petitioner told him the day the trial was set that he had a nervous breakdown, and counsel then explained to the petitioner that the only issue in a mental evaluation would be the petitioner's competency. Counsel told the petitioner that it would be difficult to have such an evaluation since the petitioner was not having trouble communicating. Nevertheless, on the day of trial, counsel did

ask that the petitioner be evaluated, and the request was denied by the trial court, as was his request for a continuance.

Trial counsel responded to the other claims made by the petitioner as to ineffective assistance of counsel. He said that the public defender's office did not prepare transcripts of preliminary hearings until the matter was actually set for trial. Although the petitioner wanted the robbery case to be tried first, the prosecutor had elected to try the burglary charges, which had the best prosecution proof, before trying the robbery case. As to the robbery case, he said that the petitioner's fingerprints were found at the scene, the testimony would be that the store's counters were cleaned each night, and that evidence, coupled with the petitioner's statement that he had never been inside of the store, would be the proof against him. He said that the petitioner's wife had brought street clothes to his office for a previous setting of the trial and that he had asked her to bring them back the next time the trial was set because he did not have any place to keep them. He said that he did not remember that the petitioner's wife was going to provide an alibi for the robbery charge. He said that he filed a discovery motion and a request for notice of the State's intention to use evidence, although such evidence was always given to him on the day of arraignment. He provided a copy of the discovery he had received to the petitioner. No other motions were filed because there were no issues requiring such motions. He did not respond to the State's motion requesting notice of an alibi defense because he did not have evidence to support such a defense. He did not file the *pro se* motion to dismiss which the petitioner had prepared and sent to him because it was not his practice to file "frivolous motions." There was no legal basis for such a motion until, perhaps, the conclusion of the State's proof during the trial. He did not believe that it was necessary to request additional investigation as to the robbery charge because he knew from the discovery what the State's evidence was, and he did not expect the case to come to trial any time soon. The petitioner had not told him of any proof which he believed warranted an investigation and had not given him an explanation of how his fingerprints came to be found at the scene of the robbery, after telling the police that he had never been there. Trial counsel was prepared for the burglary trial on the day that trial was to begin.

As for the guilty pleas, he said that the decision to plead guilty was that of the petitioner. The petitioner pled guilty reluctantly, but both of his options, to plead guilty or go to trial, were "bad." Counsel surmised that the problems in the cases may have resulted from the fact that the petitioner, and others whom counsel had represented, were assigned to the major violators' unit of the district attorney general's office, and, as a result, the guilty plea offers which they were then receiving bore "no similarity to things they've been offered in the past." He said that the sentence which the petitioner had received as the result of the guilty pleas was about what he would have received had he gone to trial and been convicted of two of the aggravated burglaries.

Following the evidentiary hearing on the post-conviction hearing, the court made the following finds of fact and conclusions of law:

## DECISION

BY THE COURT:

Well, I have reviewed the transcript of Mr. Jackson's testimony and I have reviewed the transcript of the Guilty Plea Proceedings, and I have listened to the testimony of Mr. Johnson in here today.

This Court is of the opinion, after reviewing all of that, that this is one of those circumstances in which Mr. Jackson unfortunately finds himself as – and I think Mr. Johnson summed it up fairly well – has been dealt with by the criminal justice system in the past and in a way whether you want to call it leniently or not.

And especially in Mr. Jackson's case his prior convictions were as charged, but they were for three years, four years and eight years, all run concurrently back in 1992. And because of his four prior convictions when he comes in now with three aggravated burglaries and an attempt to especially aggravated robbery, which is three C felonies and a B felony he qualifies for extensively more time. And when faced with that it's an uncomfortable predicament.

I'm satisfied from the testimony from Mr. Jackson that he gave at the last hearing that he didn't have a defense to the aggravated burglary cases, that his chief argument and his chief attack wanted to be on the more serious attempted especially aggravated robbery because that was the basis of the 20 year offer.

If he said that he had a defense to that or that he didn't do it, he didn't want to plea to it, he wanted to go to trial on that, that was his emphasis, that was his issues with Mr. Johnson, those were the areas he wanted explored, those were the areas he wanted attacked, but there was no defense to the aggravated burglaries. And it appears that that was his position then, that's still his position.

So the only area at the question was the attempt to especially aggravated robbery. Well, based on the testimony the case that was going to be tried, the first three cases that were going to be tried were the aggravated burglaries where there was a better than good possibility that Mr. Jackson would have ended up with a total sentence of very possibly 30 years or higher, and then and only then would the attempt to especially aggravated robbery have been tried.

As a result and frankly the State was in the bargaining position, they had brought the Charges, they had the strongest cases, they were

going to try the strongest cases first, which is not what Mr. Jackson wanted, it's not what his lawyer wanted, but unfortunately they don't get to call the shots.

I'm satisfied that Mr. Johnson is a good attorney, does his job, properly investigates his cases, properly represents his clients. I know how much Mr. Johnson agonizes over these kinds of offers that he is saddled with, and I know how individuals like Mr. Jackson feel when their lawyer tells them your offer is 20 years and there's nothing I can do about it – they want to blame the lawyer. The lawyer is the bearer of bad tidings and he's the one who gets saddled with the attack.

I feel that on October 11th of 1999 Mr. Jackson didn't like his deal, he didn't like his plea, he didn't like his offer but he felt it was in his best interest. That's the kind of guilty plea he entered, that's what he told Judge Daley "I didn't do this but it's in my best interest, it's what I want to do, I've conferred with my lawyer, I have examined the pros and cons, I know what I've got to lose, I know what I've got to gain, I've got 20 years in the hand, I don't like it but it's the best deal I'm going to get and it's what I'm going to plead guilty to." In effect that's what he told Judge Daley. They entered this plea.

No question as to the aggravated burglaries, but as to the attempt to especially aggravated robbery it was an Alfred [sic] Plea, that issue was explained to Mr. Jackson, he understood it, he still denied his guilt in that case but he said it was in his best interest to take the deal that he was offered, and that's what he did.

It's unfortunate Mr. Jackson finds himself in that position, but I don't find any basis to indicate to me that Mr. Jackson didn't fully understand what he was doing, entered this guilty plea freely and voluntarily with full knowledge of the amount of punishment that he was getting, the full knowledge of what was involved, that Mr. Johnson had represented him up to that point to the fullest extent available, that he represented him properly under the guidelines that was set out in the law, that had he been able to try the case I'm convinced Mr. Johnson would have defended Mr. Jackson with every fiber of his body and would have done whatever he could.

But under the circumstances Mr. Marlon Jackson found himself backed into an unfortunate corner based upon his own actions, and the 20 year offer that was put before him may have not been to his

liking but it was something he fully acknowledged and understood he knew what he was doing when he accepted it. And that's the criteria.

And for those reasons I'm going to find that Mr. Jackson did freely and voluntarily enter his guilty plea, knew what he was doing, knew the consequences of his actions, was fully advised of his rights, not only by Mr. Johnson but by Judge Daley, and as a result I'm going to find that the Petition for Post-Conviction Relief is not well taken and should be denied.

Mr. Jackson, you have a right to appeal the ruling of this Court, you have to perfect that appeal within 30 days. If you cannot afford a lawyer to represent you on your appeal I'll be glad to appoint Mr. Gilchrist to represent you on that appeal. But I need to advise you that you have to perfect your appeal within 30 days, sir. Do you understand that?

MARLON JACKSON: Yes, uh-huh (nodded head affirmatively).

THE COURT: Alright [sic]. You may be seated.

MR. GILCHRIST: Your Honor, if I may accept that appointment.

THE COURT: Alright [sic], sir, I'll appoint you for purposes of appeal.

MR. GILCHRIST: Thank Your Honor. Also I'd like to pass forward to Your Honor an Order having Mr. Jackson sent back as soon as possible, I believe his ride's here.

THE COURT: Alright [sic].

We will now consider the claims set out in the petition for post-conviction relief.

## SCOPE OF REVIEW

The findings of fact of the post-conviction court are conclusive on appeal, unless the evidence preponderates against the findings, see State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)), and the appellate court cannot "reweigh or reevaluate" the evidence. Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997), cert. denied, 525 U.S. 830, 119 S. Ct. 82, 142 L. Ed. 2d 64 (1998). However, the appellate court's review of the application of the law to the facts is *de novo*, without a presumption of correctness. See Burns, 6 S.W.3d at 461; Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997). Additionally, issues as to whether counsel was ineffective and whether prejudice resulted are mixed questions of law and fact. Burns, 6 S.W.3d at 461 (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996)).

In elaborating upon the requirement that an accused is entitled to constitutionally effective assistance of counsel, the United States Supreme Court, in Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), stated that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The Tennessee Supreme Court has often recited the two-prong test set forth in Strickland to be applied to ineffective assistance claims:

> To prevail on a claim of ineffective counsel in this proceeding, the appellant must prove by a preponderance of the evidence that the advice given or services rendered by his counsel fell below the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). He must also demonstrate prejudice by showing a reasonable probability that but for counsels' error, the result of the trial proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996).

King v. State, 989 S.W.2d 319, 330 (Tenn. 1999).

Specifically, the courts have been counseled against overdependence on hindsight in assessing counsel's performance. In fact, courts must be "highly deferential":

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana*, 350 U.S., at 101, 76 S. Ct., at 164.

Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see also Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (holding that counsel should not be measured by "20-20 hindsight"). Appellate courts must recognize that "[t]here are countless ways to provide effective assistance in any given case" and that "the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

Further, the reasonableness of counsel's decision not to investigate possible defenses is affected and guided by the client's own statements or actions:

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).

The Strickland court explained that the need to further investigate a particular line of defense "may be considerably diminished or eliminated altogether," depending upon information supplied by the client to counsel. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. "In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Id.

Additionally, since the petitioner entered pleas of guilty as to the charges against him, there are additional required showings which he failed to make. "In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985), and Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate

-15-

or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Hill, 474 U.S. at 59, 106 S. Ct. at 370.

## Voluntariness of Pleas of Guilty

In a nutshell, the situation presented here is that the petitioner, who had previous substantial experience in the criminal process as the result of prior serious felony convictions, was represented by a well experienced assistant public defender faced with strong proof of guilt against his client in at least three of the four cases against him. Trial counsel was then presented on the day of trial with the claim by his client, who had no prior history of mental problems of any sort and had not evidenced any such problems, that the trial be reset so that the client could receive a mental evaluation. The petitioner claims that his plea was involuntary because of the mental problems which he later described as "a slight mental nervous breakdown."

The test which we employ, in ascertaining the voluntariness of a guilty plea, was set out by our supreme court in Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Brady v. United States, 397 U.S. 742, 755, 90 S. Ct. 1463, 1472, 25 L. Ed. 2d 747 (1970)):

> [A] plea of guilty by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

Applying this standard, we cannot conclude that the trial court erred in determining that the petitioner's pleas of guilty were not free and voluntary. The petitioner has presented no evidence, save his unsupported claim of a nervous breakdown just before the first trial setting, of any mental problems or of an inability to understand and participate in the trial process. Trial counsel had not noticed any communication problem with the petitioner, and the guilty plea proceedings bear this out. Accordingly, we concur with the finding of the post-conviction court that the petitioner has failed to show that his pleas of guilty were not free and voluntary.

-16-

**Ineffective Assistance of Counsel**

As to the petitioner's second claim, our analysis is similar. The petitioner failed to show how any of the alleged deficiencies of trial counsel affected the outcome of the proceedings. In fact, the prosecution had elected to proceed first in a case in which the proof was overwhelming. His trial counsel's problems in trying to explain this proof to a jury would have been compounded by the fact that the petitioner had several prior serious felony convictions for similar offenses. The petitioner has failed to show how, even if trial counsel had done exactly what he claims he wanted trial counsel to do, it would have improved the predicament he was in. Likewise, the petitioner has failed to show that the alleged deficiencies affected his decision to plead guilty. Accordingly, we concur with the post-conviction court that the petitioner has failed to show that his trial counsel was ineffective.

## CONCLUSION

Based upon the foregoing authorities and analysis, we affirm the judgment of the post-conviction court dismissing the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE